NORBERT CAMP                                        CIVIL ACTION

VERSUS                                              NUMBER: 07-3866

RICHARD STALDER                                     SECTION: "N"(5)


**<u>REPORT AND RECOMMENDATION</u>**


Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2E(A), presently before the Court is the 28 U.S.C. §2254 application for federal habeas corpus relief of petitioner, Norbert Camp, the State's response thereto, and Petitioner's traverse to the State's response. (Rec. docs. 1, 18, 30). Having determined that an evidentiary hearing is not necessary, it is recommended, for the reasons that follow, that Camp's petition be dismissed with prejudice.

Petitioner Camp is a state prisoner who is presently incarcerated at the Winn Correctional Center, Winnfield, Louisiana.

On July 13, 1998, petitioner was convicted of manslaughter in the Criminal District Court for the Parish of Orleans for which he was initially sentenced to twenty-one years in the custody of the Louisiana Department of Corrections. The State subsequently filed a multiple offender bill of information against Camp and, following a hearing on July 25, 1989, he was re-sentenced to forty-two years as a triple offender under LSA-R.S. 15:529.1. On appeal to the Louisiana Fourth Circuit Court of Appeal, that tribunal reversed Camp's conviction and sentence based on the failure of the trial court to properly instruct the jury on the use of prior inconsistent statements of a particular witness. State v. Camp, 571 So.2d 195 (La. App. 4th Cir. 1990).

Following a second jury trial, on January 28, 1992, Camp was again found guilty of manslaughter. At a hearing that was subsequently conducted on June 25, 1993, Camp was adjudicated a second felony offender under R.S. 15:529.1 and was again sentenced to forty-two years at hard labor with credit for time served. On direct appeal to the Louisiana Fourth Circuit, that court affirmed Camp's conviction but vacated his sentence and adjudication as a second offender to afford him an opportunity to demonstrate that the guilty plea to the predicate offense was invalid. State v. Camp, 641 So.2d 702 (La. App. 4th Cir. 1994). Writs were denied by the Louisiana Supreme Court on February 17, 1995. State v. Camp,

650 So.2d 250 (La. 1995). Yet a third multiple offender hearing conducted on August 4, 1995 resulted in Camp's adjudication as a second offender and the reimposition of the forty-two year sentence. That sentence was affirmed on direct appeal. State v. Camp, 692 So.2d 51 (La. App. 4th Cir.)(table), writ denied, 703 So.2d 1264 (La. 1997).

Thereafter, on May 30, 1996, Camp signed and dated a post-conviction relief application ("PCRA") that he subsequently supplemented regarding his adjudication as a multiple offender. (St. ct. rec., vol. 2a of 8). On May 27, 1998, the trial court denied Camp's supplemental PCRA, a ruling that was later affirmed by the Louisiana Fourth Circuit. State v. Camp, No. 98-K-2298 (La. App. 4th Cir. Nov. 4, 1998)(unpublished order). However, the state appellate court ordered the trial court to conduct an evidentiary hearing on Camp's original PCRA within sixty days. Id. When that directive was not complied with the Louisiana Fourth Circuit issued two subsequent orders prompting the trial court to act on Camp's original PCRA under pain of contempt. State v. Camp, No. 2003-K-2241 (La. App. 4th Cir. Feb. 11, 2004 (unpublished order); State v. v. Camp, No. 2002-K-1972 (La. App. 4th Cir. Nov. 8, 2002)(unpublished order). Ultimately, the trial court conducted an evidentiary hearing on May 23, 2005 and denied Camp's original PCRA. (St. ct. rec., vol. 1a of 8). That ruling was affirmed by

both the Louisiana Fourth Circuit, <u>State v. Camp</u>, No. 2005-K-1205 (La. App. 4th Cir. Jan. 11, 2006)(unpublished order), and by the Louisiana Supreme Court. <u>State ex rel. Camp v. State</u>, 955 So.2d 1275 (La. 2007). The instant proceeding followed, with Camp signing and dating his habeas petition on July 3, 2007. (Rec. doc. 1, p. 14). As conceded by the respondent, state court remedies have been exhausted as required by 28 U.S.C. §2254(b)(1)(A) and the petition was timely-filed under 28 U.S.C. §2244(d).

To facilitate a resolution of petitioner's claims herein, the Court will recall the facts established at Camp's trial as aptly summarized by the Louisiana Fourth Circuit in the context of his direct criminal appeal, as follows:

> [o]n the morning of December 16, 1987, Angie Stewart, the daughter of the victim, Rose Stewart, was preparing to go to school while her mother prepared to go to work. The defendant came to their apartment located at 3711 N. Dorgenois Street and was admitted by the victim. He initially sat at the kitchen table. Angie Stewart and her younger sister left for school but returned a few minutes later because the younger child was complaining of a stomachache. The victim told the girls to go to school. At that time, the defendant asked Angie "Who was down the steps"? The defendant was acting frightened and was looking out the window. The two children then left for school and did not return.
>
> At approximately 8:20 a.m., Officer John Martin received a call that a fight was in

4

progress. He responded to the call, arriving within a minute or two. As Officer Martin approached the scene, he saw a human form hurtling out of an upper story window of the housing project apartment building. After he exited his vehicle, Officer Martin observed the defendant standing at the window from which the victim, later identified as Rose Stewart, had come. While tending to the victim, Officer Martin noticed the defendant come out of the building and run down the street. Officer Martin got back into his police car and chased the defendant who ran to a house owned by Forrest Harper. Officer Martin, along with back-up assistance, went into the house and apprehended the defendant who was combative, agitated, and bleeding from the hand. Officer Martin testified that he never saw anyone chasing the defendant. He never saw the defendant with anything in his hand and did not see him drop anything nor did he see anyone throw the victim from the window. Officer Martin admitted that in his police report the first mention of seeing the defendant was when he came out of the building.

The testimony of Forrest "Pops" Harper was read to the jury. Mr. Harper had testified that at approximately 8:00-8:30 on December 16, 1987, he heard a noise and disturbance at the front of his house. When Mr. Harper went to the front of the house, he saw the defendant who said "Daddy, don't let them kill me" and "They're trying to kill me". The defendant could not stand well and was covered in blood. He did not try to harm Mr. and Mrs. Harper in any way. Also, according to Mr. Harper's testimony, there were three men outside his house, one of whom was armed with a sawed-off shotgun. The three men were waiting for the defendant to come out. The defendant asked Mr. Harper to call the police.

Augustine Leaper testified that she was a

neighbor of the victim and lived in the apartment underneath the Stewarts. She heard voices upstairs, including the victim yelling "Stop, help, call the police". Ms. Leaper also heard a man's voice, which she could not identify, calling for help and for the police. She also heard that same man say he would beat Ms. Stewart if she did not shut up. Ms. Leaper further testified that she saw a man running down the stairs with a knife in his hand, but she could not identify this person because she saw only his back. Ms. Leaper did not see or hear the victim fall from the window. At the time of the trial, Ms. Leaper was in jail for crime against nature.

The prior testimony of another of the victim's neighbors, Clementine Jones, was introduced by the defense. Ms. Jones testified that she heard the defendant, whom she knew, yelling from the victim's apartment "Please call the police, they're trying to kill me". Ms. Jones called the police.

The State established that the victim's urine was negative for alcohol or narcotics. A knife was found on the walkway outside the victim's building; it had type B human blood on it. The victim's blood was Type O. Additionally, the crime lab technician took seventeen blood samples from the victim's apartment, the building, and Mr. Harper's house. Seven of those samples were sufficient to type; all were Type B. The sufficient samples from the victim's apartment were from a curtain in the bedroom and a kitchen cabinet. The rest of the samples which could be typed came from the building stairwell and the Harper house. A pipe found in the victim's apartment tested positive for cocaine. No fingerprints were taken from the victim's apartment. The burglar bars at the kitchen window were bent, and there was blood on the window sill and on the refrigerator. There were also blood stains on the bedroom

window sill and the brick portion outside the window sill; the bedroom window was the one from which the victim fell. These bloodstains were never typed because the sample was insufficient.

Dr. Paul McGarry, an expert in forensic pathology, performed the autopsy on Rose Stewart. In addition to massive internal injuries, Dr. McGarry found that the victim had defensive knife wounds on her hands. She also had a cut on her earlobe. Dr. McGarry found recent and old track marks on the victim. Dr. McGarry viewed a diagram of the defendant's hand from his Charity hospital records. That diagram showed cuts on the defendant's fingers which could have occurred by his hand slipping down on a knife blade. However, Dr. McGarry testified that the cuts were also consistent with a man reaching and grabbing a knife.

<u>Camp</u>, 641 So.2d at 704-05 (footnotes omitted).

Camp is now before the Court seeking federal habeas corpus relief under §2254, advancing four claims in support of that request. In the first of those claims, Camp alleges that he was denied the effective assistance of trial counsel in several respects. First, Camp alleges that the attorney who defended him at his re-trial was ineffective for failing to secure and present the testimony of several witnesses who had testified at his first trial in an attempt to establish that the victim had committed suicide. Second, Camp contends that trial counsel was deficient for failing to allow petitioner to take the stand and testify in

his own defense despite Camp's wishes that he be allowed to do so. Before resolving those two specifications, the Court will recite the legal standards governing the review of ineffective-assistance-of-counsel claims.

Camp alleges that he was denied the effective assistance of trial counsel as guaranteed by the Sixth Amendment. To merit relief on a claim of ineffective assistance of counsel, a habeas petitioner must satisfy the two-pronged test articulated by the Supreme Court in Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984), by demonstrating that: (1) counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. The burden of proving either element of Strickland is a heavy one and if proof of one element is lacking, the Court need not consider the other. Id. at 697, 104 S.Ct. at 2069. Strickland review is highly deferential and a petitioner must overcome the strong presumption that counsel's actions or inactions were part of a sound trial strategy. Murray v. Maggio, 736 F.2d 279, 282 (5th Cir. 1984); Boyd v. Estelle, 661 F.2d 388, 390 (5th Cir. 1981). The prejudicial element of Strickland requires a petitioner to show that, but for his attorney's errors, there is a reasonable probability that the result of the trial would have been different, a probability sufficient to undermine confidence in the outcome of the proceeding. Strickland, 466 U.S. at 694, 104

S.Ct. at 2068.

Complaints of uncalled witnesses, in an effort to demonstrate ineffective assistance of counsel, are generally disfavored in federal habeas proceedings. Murray, 736 F.2d at 282. This is so because "... the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness [would] testif[y] [to] are largely speculative." Boyd v. Estelle, 661 F.2d 388, 390 (5th Cir. 1981)(quoting Buckelew v. United States, 575 F.2d 515, 521 (5th Cir. 1978)). A habeas petitioner must thus overcome the strong presumption that his counsel's decision in not calling a witness was a strategic one, Murray, 736 F.2d at 282, and he must ultimately demonstrate that the witness was both available and would have testified favorably in his case. Gomez v. McKaskle, 734 F.2d 1007, 1109-10 (5th Cir.), cert. denied, 469 U.S. 1041, 105 S.Ct. 524 (1984); Boyd, 661 F.2d at 390. Moreover, "[i]f the facts adduced at trial point so overwhelmingly to the defendant's guilt that even the most competent attorney would be unlikely to have obtained an acquittal, then the defendant's ineffective assistance claim must fail." Green v. Lynaugh, 868 F.2d 176, 177 (5th Cir), cert. denied, 493 U.S. 831, 110 S.Ct. 102 (1989).

To better put into context the reasonableness of counsel's actions at Camp's re-trial, the Court will recall events that occurred in the course of his first trial as summarized by the

Louisiana Fourth Circuit in its resolution of Camp's appeal from that earlier proceeding.  At Camp's first trial:

> [b]oth Officer Martin and Mr. Harper testified that Talita Elder, the daughter of Camp's girlfriend, arrived at Harper's apartment soon thereafter, and told them that Camp did something "too wrong" to Ms. Stewart.  Officer Martin testified Elder told them she saw Camp holding a knife and ordering Ms. Stewart to open the kitchen window, threatening to stab her if she did not do so.  He also testified that she stated she saw Camp try to push Ms. Stewart through the kitchen window, bending the burglar bars in the process, but he was unsuccessful. He testified she told them she then saw Camp drag Ms. Stewart to the bedroom, where he "pitched" the victim out of the window.  Harper verified those statements in his testimony.
>
> Officer Martin testified the death of Ms. Stewart did not appear to have been a suicide. He also testified that Mr. Harper did not mention the three men with the shotgun standing across the street from his apartment. He admitted his police report did not mention that he had seen Camp at the window after Ms. Stewart fell, and he did not know why this fact had been omitted.
>
> Talita Elder, called as a state witness, denied making the statements at Mr. Harper's apartment which implicated Camp in Ms. Stewart's death.  She admitted going to Mr. Harper's apartment, but she insisted she only told him she was sorry for the mess Camp had made there.  She testified that earlier that morning Camp called to her and asked her to come to Ms. Stewart's apartment.  Upon her arrival she heard Camp begging for someone to call the police and to keep "them" from killing him.  She went to the apartment door which led into the kitchen, and Camp was

attempting to exit through this door at the time Ms. Stewart fell from the window. Ms. Elder also denied later telling a homicide detective that she heard someone say Camp was pushing Ms. Stewart out of a window and that she arrived in front of the building to see Ms. Stewart fall.

The defense attempted to present two different explanations for Ms. Stewart's death: (1) suicide, or (2) death at the hands of other men who were on the scene, the same men who Mr. Harper saw standing outside his apartment. To support the first theory, the defense called various ex-boyfriends, all of whom had criminal records and all but one of whom were incarcerated at the time of trial. These men testified to Ms. Stewart's drug use and her mental instability. One man testified that Ms. Stewart talked often about suicide, and another testified Ms. Stewart threatened to jump out of her bedroom window when he found her in bed with another man. Ms. Leeper testified Ms. Stewart was "taken away" once four or five years prior to her death. The defense also presented Ms. Stewart's psychiatric records, which indicated that she suffered from audio and visual hallucinations, paranoia, schizophrenia, low intelligence, and epilepsy. A psychiatrist who reviewed these records concluded Ms. Stewart's mental stability greatly improved when she was on medication, but that it deteriorated when she stopped taking the medication. He further testified he could find no evidence of any suicidal tendencies.

Camp, 571 So.2d at 196-97.

Camp's first specification of counsel's alleged ineffectiveness is that the attorney who defended him at his trial failed to present the testimony of three witnesses who had

11

testified at his first trial in an attempt to establish that the victim had committed suicide. The three witnesses in question were Lawrence Burd, Archie Sayers, and Dr. Kenneth Ritter. After taking the stand, Burd admitted to being housed in a work-release program facility at the time where he was serving the remaining portion of a sentence for possession of stolen property. He further testified that he had previously lived with the victim for two years and, during that time, had once returned home and caught the victim in bed with another man. An argument between Burd and the victim ensued, during which Burd admitted striking the victim who then supposedly threatened to jump out of a window. On cross-examination, Burd admitted abusing the victim from time to time during their relationship. He also admitted to a second conviction for possession of stolen property. Despite having lived with the victim for two years, Burd could not recall the address. Burd and Camp had discussed the pending murder trial while the two were in jail but petitioner had not proclaimed his innocence in the course of those conversations. (St. ct. rec., vol. 3, pp. 153-168).

The second witness called at petitioner's first trial in support of the suicide theory was Archie Sayers. After initially testifying that he had never been convicted of a crime Sayers admitted to having previously pled guilty to carnal knowledge of a juvenile. When asked how long he had known the victim Sayers gave

an estimate of between six and eight months but then added that he had lived with her for six months in 1985.  During that time, the victim purportedly spoke of suicide on several occasions and had also attempted to overdose once or twice.  He also stated that the victim suffered from epilepsy, had a tendency to "get nervous", and had struck Sayers several times.  On both direct and cross-examination, Sayers testified that he had not seen the victim since 1985 but then acknowledged that he had seen her several times after moving out.  Despite living with the victim for six months, Sayers did not know the victim's address, the name of the victim's younger daughter, or Ms. Leeper who lived in the apartment below the victim's. (St. ct. rec., vol. 3, pp. 168-178).

Also called in support of the suicide theory was Dr. Kenneth Ritter who reviewed and summarized the victim's treatment records from another doctor that were generated between 1978 and 1982.  Those records contained positive findings for auditory and visual hallucinations and delusions and diagnoses of schizophrenia, low IQ, and epilepsy.  Over the years, the victim had been successfully managed with medications, psychotherapy, and vocational rehabilitation but would then cease treatment.  Dr. Ritter testified that because there is no cure for schizophrenia, an affected individual may relapse when not taking prescribed medication or in response to stressful situations.  On cross-

examination, the doctor admitted that he was unable to testify to the victim's state of mind at the time of her death in 1987. There was also no indication in the medical records that the victim had suicidal ideations and there were no traces of alcohol or drugs in her system when she was killed. (St. ct. rec., vol. 3, pp. 179-197). As will be discussed more fully _infra_, over the specific advice of counsel, petitioner would subsequently take the stand and testify in his own defense. (St. ct. rec., vol. 3, pp. 197-236).

After considering the evidence before them, the jury at Camp's first trial returned with a responsive verdict of guilty of manslaughter. The minutes from the fist trial indicate that the jury's verdict was a unanimous one. (St. ct. rec., vol. 1a). Although that verdict was later reversed based on the lack of a limiting instruction on the use of Ms. Elder's prior inconsistent statements, the Louisiana Fourth Circuit nevertheless proceeded to consider Camp's second assignment of error, insufficient evidence to support the conviction. Camp, 571 So.2d at 199-201. After doing so, the Louisiana Fourth Circuit concluded that "[b]ecause the evidence supports a finding that the defendant committed second degree murder, it is also sufficient to support his manslaughter conviction." Id. at 201.

At petitioner's second trial, the theory of suicide was abandoned. Having failed to secure an acquittal at Camp's first

trial at which Burd, Sayers, and Dr. Ritter testified, and considering the credibility issues surrounding Burd and Sayers, the Court is unable to say that counsel's decision to so proceed was deficient or that the result of the second trial would have been different. Nor has Camp demonstrated that the three witnesses were available at the time of his second trial and that they would have testified any more favorably than they did in the first trial which resulted in a conviction.

The Court's conclusion that counsel's decision not to call the three witnesses was a strategic one is buttressed by the fact that counsel did present the testimony of a witness, via transcript, who was no longer available at the time of the second trial. Also noteworthy is the fact that in the direct criminal appeal following his second trial, Camp filed a <u>pro se</u> supplemental brief raising at least three additional assignments of error, including a claim that he was denied the effective assistance of counsel because counsel did not object to the State's proffer of the testimony of a witness who did testify at the first trial. <u>Camp</u>, 641 So.2d at 708-11. Yet, no claim was urged that counsel was ineffective for failing to secure the testimony of the three witnesses in question. The state courts' resolution of this claim was not an objectively unreasonable one. 28 U.S.C. §2254(d); <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13, 120 S.Ct. 1495, 1523 (2000); <u>Montoya v. Johnson</u>, 226

F.3d 399, 403-04 (5th Cir. 2000), <u>cert</u>. <u>denied</u>, 532 U.S. 1067, 121 S.Ct. 2220 (2001).

In his second specification of alleged infectiveness, Camp alleges that counsel was ineffective for failing to allow him to testify in his own defense. Once again, some historical context is needed to put this claim in proper perspective.

At his first trial, petitioner's counsel called five witnesses to testify on behalf of the defense, including the three noted above. The following then transpired:

BY MR. MERRITT:
(Defense Counsel)

On advise [sic] of Counsel, the Defense rests, Your Honor. I would like to offer the Exhibits.

BY THE COURT:

All right. Offer the Exhibits.

\*              \*

(A RECESS WAS TAKEN FOR LUNCH AT 12:45).

(TRIAL RESUMED AT 2:45).

BY THE COURT:

Are you ready to proceed, Mr. Merritt?

BY MR. MERRITT:

Your Honor, against my advice, Norbert has insisted that I move the Court in its discretion to reopen the case, to visit the scene, and to allow him to testify.

BY MR. WILLIAMS:

(Prosecutor)

    No objection from the State.

BY THE COURT:

    I'll allow him to testify, and I'll make my decision
based on visiting the scene after that. But, I'm not - -
I'm not saying I'm not going to do it. But, I will say
that I will open the case and let him testify. Sure.

BY MR. MERRITT:

    Can he visit the scene before he testifies?

BY THE COURT:

    Approach the bench.

(AT WHICH POINT AN OFF THE RECORD DISCUSSION TOOK PLACE AT THE
BENCH).
BY THE COURT:

    All right. Call the jury.

               *                 *

(THE JURY WAS BROUGHT INTO THE COURTROOM).

BY THE COURT:

    All right. It's my understanding that the Defense wants
to go forward.

BY MR. MERRITT:

    That's correct, Your Honor.

BY THE COURT:

    All right. Call your next witness.

[BY MR. MERRITT:]

    Norbert Camp.

BY THE COURT:

Norbert Camp.

(St. ct. rec., vol. 3, pp. 197-199).

Petitioner then took the stand. Upon being questioned by his attorney, Camp admitted to prior convictions for theft, aggravated battery, drug possession, and for being a convicted felon in possession of a firearm. Petitioner then launched into a well-rehearsed narrative of the events leading up to the murder, even using as a demonstrative aid a diagram of the victim's apartment which had been prepared at his direction while he was in jail awaiting trial. Pertinent to the matter at hand are the following excerpts from petitioner's direct examination:

* * *   (A DIAGRAM OF THE APARTMENT IN QUESTION WAS GIVEN TO THE WITNESS.).

BY THE WITNESS:

<u>Ladies</u> <u>and</u> <u>gentlemen</u>, <u>I</u> <u>couldn't</u> <u>sit</u> <u>over</u> <u>there</u> <u>and</u> <u>not</u> <u>tell</u> <u>ya'll</u> <u>hear</u> <u>my</u> <u>side</u> <u>of</u> <u>the</u> <u>story</u>.

BY MR. WILLIAMS:

Objection.

BY THE COURT:

Objection sustained.  Just answer the question.

BY MR. MERRITT:

I will show you what I will mark as D-5, for purposes of

this Exhibit, and offer to you for your explanation to the jury, and any of the Exhibits in here that the State has introduced.

***THE EXHIBITS WERE VIEWED BY THE WITNESS.

BY MR. MERRITT:

Q:   Before you examine this, does this report [sic] to be a diagram of the third floor?

A:   Yes.

Q:   Do you know who did that?

A.   Yes, I had someone - - - under my directions I had someone to draw this diagram for me while I was in the Parish Prison, and I gave it to my Attorney.

     May I get up, Your Honor?

BY THE COURT:

     What's that?

BY THE WITNESS:

     May I get up to explain myself?

BY THE COURT:

     Get up for what reason?

BY THE WITNESS:

     To stand right there and - -.

BY THE COURT:

     No, no.  Your going to have to do it from right here.

          * * * * * * * * * * * * * * *

Q.   Do you remember arriving at Charity Hospital?

A. I remember when the officer put me into the car, he brought me back around to the scene, and took me where it was. I still hadn't seen Rose. I didn't know Rose had came out the window. All I seen was a crowd of people standing around. And, I went to hollering. I said, "man", I say "somebody around here trying to kill me and ya'll bringing me back around here. What you trying to do? You trying to set me up?" And, they began to make all kind of smart remarks. I was over excited from the scuffle that I had. I was over excited and I kind of went off from there. When I got to Charity Hospital I can't remember too much. I was high. I was under the influence of Cocaine. I did had used Cocaine. But, I wasn't to the point where I did not know what I was doing, or I was crazy, or unconscious, or anything like that there. I knew right from wrong. I was not crazy. I know I did not throw Rose out the window. And, <u>I had to tell my side of the story today</u>. I know, Mr. Williams - - -

BY MR. WILLIAMS:

I object to that, Judge.

BY THE COURT:

Objection sustained.

BY THE WITNESS:

Your Honor - - - -.

BY THE COURT:

All right. Just confine yourself to the questions of the case.

BY THE WITNESS:

Well, can I ask you this, Your Honor? Your Honor, this is my life at stake, and I - - -

BY MR. WILLIAMS:

I object to this, Your Honor.

BY THE COURT:

Objection sustained.  Answer the question.

BY MR. MERRITT:

Tender the witness.

(St. ct. rec., vol. 3,
pp. 202-203, 207-
208)(emphasis added).

On cross-examination, petitioner testified, in pertinent part
as follows:

Q.   And, then you were convicted again. For Possession of T's
     and Blues?

A.   I pleaded guilty.

Q.   Are you telling this jury that you didn't commit this
     crime?

A.   Well, the police officer said they found T's and Blue's
     in my car.  If I'm not mistaken it was one or two
     tablets.  They said they found it in my car.  I couldn't
     say that it was there or wasn't there.

Q.   Mr. Camp, you plead guilty - - -.

A.   I pleaded guilty because I was on the street, I had just
     come home, I was offered another probation providing that
     I attend a drug rehabilitation program, which I accepted.
     And, I was given probation for that charge. In other
     words, what I'm saying is a lot of times in a lot of
     situations, sometimes the circumstances and situations,
     you have to plead guilty, just like you tried to keep me
     off the stand because of my record, they'll force that
     upon you and say if you don't take this, this here is
     going to happen.  This is the reason why I went on and
     took probation.

          *  *  *  *  *  *  *  *  *  *  *  *  *  *

Q.   You also had possession of Marijuana at that time?

A.   I had a marijuana cigarette in my shirt pocket.  I
     pleaded guilty and received six (6) months.  I served my
     time on that.  I'm not on Trial for any of that.  I'm on
     Trial for second-degree murder today.

Q.   You got an explanation for everything; don't you?

A.   It's not that I have an explanation.  I'm just trying to
     explain myself, Mr. Williams.  I want the jury to hear my
     side of the story - - - what happened.

               * * * * * * * * * * * * * *

Q.   You continued to break the law; didn't you?

A.   What you mean?

Q.   Using Cocaine?

A.   Using Cocaine?

Q.   You know that's against the law?

A.   I got high.

Q.   What?

A.   I did get high.

Q.   Well, how many times did you get high using Cocaine?

A.   I don't know, Mr. Williams.

BY MR. MERRITT:

     That's objectionable, Your Honor.

BY THE COURT:

     Objection overruled.

BY MR. MERRITT:

He's admitted it.  That's objectionable.  I'm asking the
Judge - - - -,

BY THE COURT:

Objection overruled.  Let's - - -.

BY THE WITNESS:

Ladies and gentlemen, I have used Cocaine in my life.
That don't' have anything to do with this charge here
today that I'm on.  I'm charged with throwing Rose
Stewart out the window.  I did not throw Rose out the
window.  <u>Whatever</u> <u>you</u> <u>say</u> <u>Mr</u>. <u>Williams</u>, <u>to</u> <u>try</u> <u>and</u>
<u>discredit</u> <u>me</u>, I'm telling you, I did not throw Rose out
the window.

BY MR. WILLIAMS:

Your Honor, I must object to him speaking to me about
this.

BY THE WITNESS:

You're asking me questions.

* * * * * * * * * * * * *

Q.  Why were you foaming at the mouth?

A.  Mr. Williams, I had been running.  Right now, ****

(AT WHICH POINT THE DEFENDANT SPIT IN HIS HAND AND SHOWED
IT TO THE JURY AND MR. WILLIAMS:

BY THE WITNESS:

Q.  You can call that foam.

A.  That looks like foam from my mouth being dry.  That's
what was in my mouth.

Q.  So, you weren't foaming at the mouth?

A.  If you want to call this foam.  May I have a piece of
paper or something?

* * * * * * * * * * * * * *

Q.   It's your testimony that you did not see Rose Stewart go
     out of the window, that you did not throw her out the
     window, and you were never in the window.

A.   That's my testimony.

BY MR. WILLIAMS:

     I have no further questions.

BY THE COURT:

     Any other questions?

BY THE WITNESS:

     I've offered to take a polygraph test - - -.

BY MR. WILLIAMS:

     Judge, - - -

BY THE COURT:

     Wait just one second.  Wait till someone asks you a
     question.

                                    (St. ct. rec., vol. 3,
                                    pp.  212-213,  214-215,
                                    233-234,    236)(emphasis
                                    added).

Among the other notable admissions made by petitioner during

cross-examination were that he had been released from Angola only

six weeks prior to the murder, that he had used cocaine

intravenously earlier on the morning of the murder, and that he had

not slept the night before the murder. (St. ct. rec., vol. 3, pp.

208, 216-217).  Camp even suggested to jurors that he had been "set

24

up" by the victim – that she had lured him to her apartment under the ruse of needing a ride to a job interview only for the purpose of launching an unprovoked knife attack upon him. (<u>Id</u>. at p. 219). Despite the defense's efforts, the jury at Camps' first trial found him guilty by a unanimous vote.

As the foregoing testimonial excerpts make clear, petitioner's conduct at his first trial in terms of his personal involvement in the presentation of the defense was well-rehearsed, purposeful, calculated, and deliberate. It is against such conduct that his present claim of being denied the right to testify by counsel at his second trial be evaluated. In opening statements at that second trial petitioner's attorney reiterated his client's Fifth Amendment privilege but qualified it by adding that "Mr. Camp has asked me to make – – point out a few things to you as to what this case will be." (St. ct. rec., vol. 4, p. 74). Counsel then proceeded to summarize the evidence that would be presented consistent with the second of the two defense theories that had been utilized at the first trial. (<u>Id</u>. at pp. 74-76). In closing arguments, counsel again stressed the Fifth Amendment privilege in explaining why he had advised his client against taking the stand. (<u>Id</u>. at pp. 132-136). During the State's rebuttal, petitioner interrupted the proceeding with an outburst to the effect that others were present in the victim's apartment which led to her

25

death and he had to be removed from the courtroom. (<u>Id</u>. at pp. 142-146).  Tellingly, in the <u>pro</u> <u>se</u> supplemental appellate brief that he filed in the direct appeal of his conviction, Camp made no claim that counsel was ineffective for not allowing him to testify. <u>Camp</u>, 641 So.2d at 708-11.

As noted by the District Judge to whom this case is allotted, a criminal defendant has a constitutional right to testify in his own behalf.  <u>Swinner v. Cain</u>, 2009 WL 2045983 at *10 (E.D. La. July 13, 2009)(citations omitted).  "A habeas petitioner, however, has the burden of proving that he was denied this constitutional right." <u>Id</u>.  "'[A] petitioner in a habeas proceeding cannot prevail on such a claim merely by stating to the habeas court that he told his trial attorney that he wished to testify and that his attorney forbade him from taking the witness stand.'" <u>Id</u>. (internal citations omitted).  A petitioner's "barebones assertion" to this effect is insufficient to require a hearing or other action on the claim.  <u>Barnes v. Cain</u>, 2008 WL 4298462 at *4 (E.D. La. Sept. 16, 2008)(quoting <u>Underwood v. Clark</u>, 939 F.2d 473, 476 (7th Cir. 1991)).  The Fifth Circuit has held that there is "'a strong presumption that counsel's decision not to place [a defendant] on the stand was sound trial strategy.'" <u>Bower v. Quarterman</u>, 497 F.3d 459, 473-74 (5th Cir. 2007), <u>cert</u>. <u>denied</u>, ___ U.S. ____, 128 S.Ct. 2051 (2008)(quoting <u>Sayre v. Anderson</u>, 238 F.3d 631, 635) (5th Cir.

2001)).

At his first trial, petitioner insisted upon testifying contrary to the explicit advice of his counsel and was convicted by a unanimous verdict. He was thus well-aware of his testimonial rights at the time of his re-trial. Given the extent to which Camp was impeached at his first trial and the overall lack of quality of his testimony at that proceeding it is entirely understandable why counsel advised petitioner against taking the stand. <u>Bowers</u>, 497 F.3d at 474-74; <u>Palmer v. Cain</u>, 2008 WL 2536097 at *5 (M.D. La. June 24, 2008). As part of its response in this matter, the State has provided the Court with written statements from the two prosecutors at Camp's second trial wherein they state that they have no recollection of defense counsel refusing to allow petitioner to testify over his express wishes. (St. ct. rec., supp. vol. 1). Petitioner, on the other hand, can point only to a brief gap in the transcript of his attorney's closing arguments that preceded his general comments to the jury. (St. ct. rec., vol. 4, pp. 132 <u>et</u> <u>seq</u>.). This gap, Camp suggests, coincides with the very moment that he realized that his attorney would not be calling any witnesses, causing Camp to interrupt the proceeding and make known his desire to testify. The Court is not persuaded. At his first trial Camp made the election to testify before the State had called rebuttal witnesses and well before closing arguments even

27

began.  Moreover, the statements that counsel made at the close of petitioners's second trial support the inference that Camp's decision not to testify was a strategic one.  The state courts' resolution of this specification of alleged ineffectiveness was not objectively unreasonable.

In his second claim for relief Camp urges as another instance of alleged ineffectiveness counsel's failure to object to the admission of Officer Lauer's testimony from the first trial without showing that the officer was unavailable.

Officer Michael Lauer was the technician who processed the crime scene by taking numerous photographs and collecting and marking physical evidence including the knife and seventeen blood samples.  His testimony at the first trial was fairly routine, almost mundane, to the point where the jurors were perceived as becoming sleepy and needing to stand to stay alert. (St. ct. rec., vol. 3, pp. 63-81).  At petitioner's second trial, the State offered the transcript of Lauer's testimony from the first trial, deleted therefrom portions of the officer's cross-examination where he discussed where certain blood samples had been found and some photographs from the crime scene had been taken. (St. ct. rec., vol. 4, pp. 74-94).  Both juries considering Officer Lauer's testimony live and in full and in a slightly condensed version found Camp guilty of manslaughter.

Here, petitioner makes no showing that Officer Lauer was available to testify live at his second trial nor has he demonstrated that the result of his second trial would have been different if he had. Although the officer's testimony was needed from an evidentiary standpoint, it was certainly not what can be described as compelling. Given the rather "vanilla" nature of Officer Lauer's testimony, it is also possible that the admission of the transcript without objection from the defense was part of an accommodation whereby the State would not object to the defense's use of Clementine Jones' testimony from the first trial via transcript. (St. ct. rec., vol. 4, pp. 125-131). Neither deficient performance nor prejudice is established here.

Petitioner's third claim for relief is that he was denied his right to full judicial review due to the absence from the trial transcript of the beginning portions of the defense's closing argument. That gap in the transcript, Camp suggests, contains his on-the-record protestations that no witnesses had been called on his behalf and that his counsel had somehow waived his right to testify over his objection.

A fair reading of the transcribed portions of the defense's closing argument and the trial judge's instructions to the jury reveals that petitioner made the strategic decision to rest on his Fifth Amendment rights rather than to testify and be repeatedly

impeached as he was at his first trial. (St. ct. rec., vol. 4, pp. 132-146 and 1-54). Also noteworthy is the fact that in his pro se supplemental appellate brief to the Louisiana Fourth Circuit, Camp made no claim that the record was inadequate for meaningful judicial review or that counsel had disallowed him from testifying. Statements from the prosecutors present at Camp's second trial point to the opposite conclusion. Petitioner was afforded an opportunity to develop the factual basis of his transcript gap claim in the proceedings held on his state application for post-conviction relief but he presented no evidence or witness testimony beyond himself. Having viewed Camp's demeanor and in light of the evidence that was presented, the state habeas court readily concluded that petitioner's allegations were self-serving and unworthy of belief. The small missing portion of the transcript would not contain events which did not take place. This claim is without merit.

In his fourth and final claim for relief, Camp alleges that the evidence presented at his trial was insufficient to support a conviction for manslaughter. The appropriate standard for review of such a claim is "... whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99

30

S.Ct. 2781, 2789 (1979).  The Fifth Circuit has held that in making

determinations on the sufficiency of the evidence, the Court should

not substitute its view of the evidence for that of the fact

finder, but should consider all of the evidence in the light most

favorable to the prosecution.  <u>Whitmore v. Maggio</u>, 742 F.2d 230,

231-32 (5th Cir. 1984).  The assessment of whether the commission

of a crime is adequately supported by the record necessarily

entails reference to the substantive elements of the criminal

offense as defined by state law.  <u>Alexander v. McCotter</u>, 775 F.2d

595, 597-98 (5th Cir. 1985); <u>Turner v. McKaskle</u>, 775 F.2d 999, 1001

(5th Cir. 1983).

Louisiana law defines manslaughter, in pertinent part, as

follows:

> (1) A homicide which would be murder under
> either Article 30 (first degree murder) or
> Article 30.1 (second degree murder), but the
> offense is committed in sudden passion or heat
> of blood immediately caused by provocation
> sufficient to deprive an average person of his
> self control and cool reflection.  Provocation
> shall not reduce a homicide to manslaughter if
> the jury finds that the offender's blood had
> actually cooled, or that an average person's
> blood would have cooled, at the time the
> offense was committed; or
>
> (2) A homicide committed, without any intent
> to cause death or great bodily harm.
>
> (a) When the offender is engaged in the
> perpetration or attempted perpetration of any
> felony not enumerated in Articles 30 or 30.1,

or if any intentional misdemeanor directly
affecting the person.

                              LSA-R.S. 14:31(A).

In passing upon Camp's insufficiency-of-evidence claim in the

context of his direct criminal appeal, the Louisiana Fourth Circuit

observed as follows:

> [i]n the instant case, the jury rejected the
> defendant's hypothesis of innocence, that some
> other person or persons were in the victim's
> apartment and attacked both Rose Stewart and
> himself, then pursued him to the Harper home.
> The testimony of Officer Martin was that no
> one was chasing the defendant when he left the
> building, nor did anybody chase him to the
> Harper house. Officer Martin also testified
> that he saw the defendant at the window from
> which Ms. Stewart fell, although this fact was
> not reflected in the initial police report.
> The knife found outside the victim's apartment
> building could easily have been dropped by the
> defendant as he fled. The bedroom of the
> victim's apartment contained at least one
> blood stain which did not belong to the
> victim.[1]/
>
> Regarding Ms. Jones' testimony that she
> observed a man enter the apartment building in
> which the victim resided, that man could have
> been headed to any one of the apartments

---

[1]/ No direct evidence was presented by the State to show that
the defendant's blood type was Type B, which was the only type
found among those samples which were large enough to be analyzed.
The jury could have drawn an inference that the defendant has Type
B blood because the blood samples taken from the Harper home were
Type B, and Mr. Harper identified the blood stains (as depicted in
photographs taken in his home) as having been left by the
defendant.

located in the project building. No where in her testimony did Ms. Jones state that this individual entered the victim's apartment. Ms. Jones duly noted that it was not unusual for men to be entering the apartment building, and therefore, she did not attach any significance to seeing him enter. Lastly, Ms. Jones testified to hearing only two voices coming from the apartment, that of the victim and appellant.

Appellant's position is that there were other men in the victim's apartment while he was screaming for help. However, the man Ms. Jones allegedly saw entered the building as the disturbance was in progress. Considering this man was seen entering the building on the first floor while the disturbance was in progress, the jury could conclude quite easily that he was not involved in the activities surrounding the victim's death.

Viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that every reasonable hypothesis of defendant's innocence was excluded. Accordingly, this assignment of error is without merit.

<u>Camp</u>, 641 So.2d at 707-08.

Having reviewed the trial transcript in its entirety, the Court readily agrees with the Louisiana Fourth Circuit's assessment of the evidence. Petitioner points to nothing that would alter the state courts' conclusion and the Court is hardly in a position to second-guess the jury's credibility determinations. <u>See</u>, e.g., <u>Marler v. Blackburn</u>, 777 F.2d 1007, 1011-12 (5th Cir. 1985); <u>Armstead v. Maggio</u>, 720 F.2d 894, 896-97 (5th Cir. 1983); <u>Dunn v.</u>

<u>Maggio</u>, 712 F.2d 998, 1001 (5th Cir. 1983), <u>cert</u>. <u>denied</u>, 465 U.S. 1031, 104 S.Ct. 1297 (1984). Although not dispositive, the Court also recalls that the Louisiana Fourth Circuit had previously found that the evidence presented at Camp's first trial was sufficient to sustain a conviction for second degree murder. <u>Camp</u>, 571 So.2d at 199-201. The state courts' determinations are entitled to great weight here, <u>Poretto v. Stalder</u>, 834 F.2d 461, 467 (5th Cir. 1987), and are far from being so objectively unreasonable so as to justify federal habeas relief. <u>Virgil v. Dretke</u>, 446 F.3d 598, 604 (5th Cir. 2006).

## RECOMMENDATION

For the foregoing reasons, it is recommended that the application for federal habeas corpus relief of Norbert Camp be dismissed with prejudice.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. <u>Douglass v. United Services Auto. Assoc.</u>, 79 F.3d 1415 (5th Cir. 1996)(<u>en banc</u>).

New Orleans, Louisiana, this  28th  day of _____October_____ ,
2009.

_____
ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE